

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KDE:JPM/DEL

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 21, 2021

By ECF and E-mail

The Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Domenick Ricciardo
                Criminal Docket No. 21-466 (ARR)

Dear Judge Reyes:

      The government respectfully submits this letter in opposition to defendant Domenick Ricciardo's renewed application for pretrial release dated October 1, 2021 ("Def. Motion"). See ECF Dkt. No. 105. The government submitted a detention memorandum in this case, see ECF Dkt. No. 20, which sets forth the government's principal arguments for detention with respect to Domenick Ricciardo. As outlined in the original detention letter and further detailed herein, Ricciardo's application should be denied because he is, by clear and convincing evidence, a danger to the community, witnesses and victims in this case. That alone warrants the continuation of the permanent order of detention. Further, the various health concerns cited by the defendant can be appropriately addressed by the Bureau of Prisons and do not form a basis for release. For the reasons set forth below, the Court should continue the order of detention against Ricciardo.

I.      Background

      Domenick Ricciardo was arrested on September 14, 2021, on an Indictment charging him with racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Two); Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Three); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Four); attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); conspiracy to commit fraud in connection with means of identification, in violation of 18 U.S.C. § 1028(f) (Count Six); fraud in connection with

means of identification, in violation of 18 U.S.C. § 1028(a)(7) (Count Seven); and conspiracy to make false statements (Count Eight).

He was arraigned later that day before the Honorable Taryn A. Merkl, United States Magistrate Judge, who held a detention hearing. Domenick Ricciardo sought release on a recognizance bond in an amount set by the Court as well as other conditions, including curfew and electronic monitoring. The government opposed and argued Ricciardo posed a danger to the community. Judge Merkl entered a permanent order of detention on the basis that Ricciardo posed a danger to the community. In reaching this conclusion, Judge Merkl recognized Ricciardo's health issues and ties to the community, but found that based on "the long-term participation of Mr. Ricciardo in the extortion that literally is the heart of this case," ECF Dkt. No. 105-1 at 22, as well as "the nature of the allegations and the strength of the evidence, which I find as to Mr. Ricciardo, the strength of the evidence is significant. I find that the totality are in favor of Mr. Ricciardo's pretrial detention." Id. Judge Merkl noted Ricciardo is "charged with being a principal player in a very long-term extortion. These labor racketeering cases are not victimless crimes. Mr. Ricciardo and his cousin Vincent Ricciardo, as detailed in the detention memo, went to great lengths to place John Doe #1 and his family in fear." Id. at 23.

On October 1, 2021, Domenick Ricciardo filed a renewed bail application in which he argues that (1) he poses no danger to the community, (2) even if so, conditions of release can mitigate any risk, and (3) his continued incarceration at the Metropolitan Detention Center ("MDC") presents unacceptance health risks. These arguments misstate and downplay his involvement in a twenty-year extortion scheme that relied on the potential for and threats of violence, propose inadequate conditions of release, and raise health concerns that Ricciardo brings to the Court before even raising them to the MDC.

II.     The Defendant is a Danger to the Community, Including the Victims in this Case

The defendant is charged with offenses involving actual, long-running threats of violence directed toward multiple victims. These offenses including Hobbs Act extortion and extortion conspiracy, in violation of 18 U.S.C. § 1951.[1] The evidence, as alleged in the Indictment and proffered here, demonstrates the extortion here was indisputably threatening and gauged to cause significant fear in its execution by the defendant and his co-conspirators.

---

[1] These offenses are crimes of violence for purposes of the Bail Reform Act. See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) ("Certainly, it cannot be gainsaid that extortion is a "crime of violence" as that term is defined by the [Bail Reform Act]."); United States v. Santora, 225 F. App'x 21, 22 (2d Cir. 2007) (upholding district court's finding for pretrial detention purposes that defendant "had committed a crime of violence, specifically conspiracy to commit extortion" (citing 18 U.S.C. § 3142(e); Ciccone, 312 F.3d at 541)) (unpublished decision).

The defendant's bail application, on the whole, trivializes the significance of the conduct and downplays the defendant's role in it.

First, the defendant's bail application attempts to sterilize what were brazen and indisputably threatening acts by the defendant toward a labor union official and his wife. That official, who is identified in the Indictment as John Doe #1, has made extortionate payments of several thousand dollars each month to Vincent Ricciardo and Domenick Ricciardo for the better part of 20 years. The evidence here shows this was not merely "menacing" (Def. Motion at 4), but a prototypical extortion scheme in which actual threats of harm were delivered. This is more than a bare accusation; the evidence is overwhelming and the defendant's guilt in this matter is clear. In January 2020, Domenick Ricciardo attempted several times to contact John Doe #1 by phone. After John Doe #1 did not answer Ricciardo's calls, Ricciardo approached John Doe #1 in a grocery store and told him that Vincent Ricciardo, his co-defendant in this case, needed to speak with him. Shortly thereafter, Vincent Ricciardo and co-defendant Michael Uvino went to John Doe #1's home at night to threaten him. Three days later, on January 26, 2020, Domenick Ricciardo went to John Doe #1's home and tried to collect the monthly extortion payment that Vincent Ricciardo and Uvino had sought days earlier. John Doe #1 was not home at the time. Domenick Ricciardo was recorded on video surveillance at John Doe #1's home. In a subsequent call between John Doe #1 and Domenick Ricciardo (which was not recorded), Domenick Ricciardo threatened John Doe #1 and his spouse. Several days later, on February 3, 2020, John Doe #1 received text messages from Domenick Ricciardo, asking when John Doe #1 wanted to meet. John Doe #1 then left a payment for Domenick Ricciardo to retrieve. About one month later, Domenick Ricciardo again contacted John Doe #1 to see when the extortion payment would be delivered. One month later, in April 2020, Domenick Ricciardo ("DR") pressured John Doe #1 ("JD#1") by text message:

**April 2, 2020**
DR (1:19 p.m.): Whats up?  U stopping by?
    (2:05 p.m.): Hey this is the 2nd text, there isnt going to be a 3rd.
JD#1 (2:06 p.m.): [Restaurant name]
    (2:06 p.m.): Don't understand
DR (2:09 p.m.): ? Its there?
JD#1 (2:09 p.m.): It's been there since I was asked last week
DR (2:10 p.m.): First im hearing about it
    (2:13 p.m.): They open?
JD#1 (2:14 p.m.): Yes.

As Judge Merkl noted at the prior bail hearing for Domenick Ricciardo with respect to the defendant's sending the message, "Hey this is the 2nd text, there isnt going to be a 3rd," "[o]nly people with deep connections to an organized criminal group and a history of representations of threats of violence can send a text message like that with effect." See ECF Dkt. 105-1, at 23.

In May 2020, Domenick Ricciardo again texted John Doe #1 to demand payment. During this exchange, John Doe #1 informed the defendant that his paycheck had been delayed and reduced by COVID-19 shutdowns. The exchange between the two showed that Domenick Ricciardo (in coordination with Vincent Ricciardo) nevertheless demanded the money:

**May 1, 2020**
| | | |
|---|---|---|
| DR | (4:30 p.m.): | Whats up? |
| JD#1 | (4:32 p.m.): | Not a lot. |
| | (4:32 p.m.): | What's going by you? |
| DR | (4:34 p.m.): | Nothing, stuck n house like everybody- u swing by? |
| JD#1 | (4:35 p.m.): | Not going to happen this month. Due to massive layoffs. I have not got a paycheck. |
| | (4:35 p.m.): | It's crazy out there |
| DR | (5:40 p.m.): | When did u no u werent getting pd? |
| JD#1 | (5:54 p.m.): | No clue. Nobody working. |
| DR | (5:57 p.m.): | Ur friend wants 2 no when u knew their was no pay |
| JD#1 | (6:06 p.m.): | Just recently |
| DR: | (6:13 p.m.): | Ur friend says thats not an answer was it this wk last wk last month |
| | (6:24 p.m.): | Haven't gotten an answer yet he says its a simple question |
| JD#1 | (6:26 p.m.): | Don't understand |
| DR | (6:29 p.m.): | When did u no their was no pay- just recently- is no answ |
| JD#1 | (6:42 p.m.): | Dont know what you want to hear. I. Can't give what I don't have |

Toll records showed that during this exchange, Domenick Ricciardo and Vincent Ricciardo spoke repeatedly. Further, Domenick Ricciardo continued to pressure John Doe #1 the following day:

**May 2, 2020**
| | | |
|---|---|---|
| DR | (1:00 p.m.): | What time do u want to met? |
| | (1:40 p.m.): | Did u talk to ur friend yet? |
| | (1:47 p.m.): | How about a yes or no |
| | (2:53 p.m.): | Im not texting no more |
| JD#1 | (3:26 p.m.): | Didn't have my phone. |
| DR: | (3:29 p.m.): | Ck with ur boss |
| JD#1 | (3:30 p.m.): | Don't know what you want to hear. I can't give what I don't have. |

These text messages, regularly demanding payment from John Doe #1, are far more than menacing or harassment; they are clear evidence of the defendant's active and willing participation in a textbook shakedown. And in August 2020, after John Doe #1 left the

4

monthly extortion payment for pickup, law enforcement officers watched Domenick Ricciardo retrieve the money and then drive to meet with Vincent Ricciardo, Uvino and others. Further, the investigation showed that Domenick Ricciardo repeatedly drove by John Doe #1's home, in an apparent effort to intimidate John Doe #1 and his family.

Second, the defendant's argument that his release is warranted because his conduct did not involve a "single act of actual violence" (Def. Motion at 4) trivializes this long-running and dangerous scheme by seeking to capitalize on a meaningless distinction that while John Doe #1 and his family were repeatedly threatened with harm, they were never actually injured. The defendants, however, never had to resort to physical harm because Ricciardo's threats were enough to ensure John Doe #1 paid. Furthermore, that argument is cold comfort to victims of extortion, especially those who live in close proximity to their tormentors and who have had them appear uninvited at their home.

Third, the defendant's reliance on United States v. Campos, 19-CR-575 (ECF Dkt. No. 105), is misplaced. The government is not relying on mere "affiliation" with a crime family here. As outlined above and in the original detention memorandum, there is clear and direct evidence of this defendant threatening violence in order to ensure the scheme's success. There is also direct evidence that the co-defendants with whom Domenick Ricciardo was closest, including his cousin Vincent Ricciardo, made clear and unequivocal threats toward John Doe #1. Domenick Ricciardo repeatedly references his cousin in the text message conversation cited above ("[u]r friend wants 2 no when u knew their was no pay" and "[u]r friend says thats not an answer was it this wk last wk last month"). Thus, not only was the defendant associating with people he knew could engage in violence towards John Doe #1, he was trading on their name and reputation in demanding John Doe #1 make payments.

Fourth, the defendant's argument that "long-term participation" in the charged offenses does not "speak to dangerousness at present" is illogical. The defendant's years' long involvement in the offense – and the Colombo crime family – is indicative of his comfort with and commitment to the extortion. This was not a situation where he, on one occasion, picked up a payment because his cousin was unavailable to collect the money. The defendant was the regular face of the extortion with John Doe #1, and the person chiefly responsible for delivering threats to John Doe #1 when a payment was late or short, as seen above.

In sum, the cursory overview of the defendant's conduct offered in his bail application inaccurately downplays the length, severity and involvement of the defendant. The defendant has, for many years, been an associate of the Colombo crime family, and one who by his own conduct, not merely his association, has shown the commitment to threats of violence on which the success of the mafia depends. The evidence establishes he is a clear danger to the community.

5

### III. Proposed Conditions of Release Cannot Mitigate This Danger

The defendant's proposed bail package (Def. Motion at 19) does not reasonably assure the safety of the community, including John Doe #1 and his family.

As a preliminary matter, Domenick Ricciardo argues that his health conditions would prevent him from engaging in any acts of violence or threats of violence. However, he does not argue his health conditions are newly diagnosed, and therefore, he presumably also suffered from these conditions when he previously threatened and intimidated John Doe #1 during the course of the charged extortion. If released, he could continue to do so despite these health conditions.

The defendant's promises to abide by conditions of release should be viewed skeptically in light of the significant fraudulent conduct in which he engaged. Although the Pretrial Service Report indicates the defendant has not worked since 2006, he in fact was regularly employed at a sham workplace safety training school run by co-defendant John Ragano. There, the defendant repeatedly coached "customers" to lie on paperwork and assisted in submitting materials to the government replete with lies. For example, in a wiretap interception of the defendant's telephone on August 28, 2020 (DR #58), the defendant coached an individual seeking an OSHA training certification on the storyline to follow on the OSHA classes:

| | |
|---|---|
| D. RICCIARDO: | Yeah. Well what it is, like, when you came here Saturday and we took your picture right? |
| Customer: | Yeah but I never sat down for the class actually. |
| D. RICCIARDO: | Whoa whoa whoa. Saturday was the class. You were there Saturday for the class. |
| Customer: | Yeah ok. |
| D. RICCIARDO: | Ok. And you took your picture? |
| Customer: | Yes. |
| D. RICCIARDO: | Now what they have to do is when you go there to get your card, alright cause they gave you a card, they wanna take your picture to confirm that you're the guy that took the class. |
| Customer: | Oh. |
| D. RICCIARDO: | That you didn't pay somebody to take the class for you. |

Additionally, in October 2020, an undercover law enforcement officer ("UC-1") visited the school where the defendant worked and obtained from Domenick Ricciardo a blank test form for the exam required to obtain a 30-hour OSHA card, an answer sheet for that test, and a sign-in sheet for the class roster. Several weeks later, UC-1 returned to pick up his OSHA-30 card, paying a total of $500. Domenick Ricciardo also subsequently provided UC-1 a New York City site-safety training ("SST") card in exchange for $450, despite the undercover officer, again, having not attended any required training classes or completed any class requirements.

Moreover, endorsing the elaborate conditions of release proposed by the defendant, which amount to the reconstruction of a detention facility in the defendant's home, would run afoul of the precedent in the Second Circuit on the release of dangerous defendants. See United States v. Millan, 4 F.3d 1038, 1049 (2d Cir. 1993) ("Home detention and electronic monitoring 'at best elaborately replicate a detention facility without the confidence of security such a facility instills.'") (internal quotation marks and citation omitted). Here, the Court need not establish a precedent that an indisputably dangerousness defendant may be released where complex conditions of home incarceration can be imposed. See, e.g., United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility.").

IV.     The Defendant's Health Conditions Are Not a Basis for Release

Domenick Ricciardo's arguments as to his health conditions and the conditions at the MDC are not a sufficient basis for his release. Nor are they an apparent obstacle to his participation in criminal conduct, as the proffered health conditions were present during the time of his participation in the charged conduct.

Domenick Ricciardo argues that he is at increased risk for serious illness were he to contract COVID-19 because of his obesity and rheumatoid arthritis. Ricciardo concedes he is fully vaccinated, having received his second dose of the Pfizer vaccine in April 2021. Given current medical understanding, the Pfizer vaccine is extremely effective at preventing serious illness from COVID-19 so the threat of Ricciardo becoming seriously ill is greatly reduced as compared to those who have not been vaccinated. According to counsel for the MDC, the MDC is providing vaccination boosters to inmates who qualify and Domenick Ricciardo is scheduled to receive the booster shot.

Domenick Ricciardo also states that the MDC has not provided him the medication in the dosages he requires, specifically, he states that he receives 50 ml of Methotrexate (as opposed to 100 ml) and is denied baby aspirin and Montelukast. According to MDC counsel, Ricciardo's current methotrexate dosage was provided on his intake screening at the MDC and verified with his pharmacy. His screening did not include prescriptions for aspirin and Montelukast and therefore he is not currently provided these medications but, counsel for the MDC stated, Ricciardo can seek additional treatment by filing a request with the medical unit.

The defendant also raises other issues concerning his conditions of confinement at the MDC, namely lockdowns and the consequences maintenance performed at the facility between October 8 and 10, 2021. These issues are not a basis for his release given the danger he poses and the temporary nature of the conditions. As to the first concern, Ricciardo was located in a housing unit, which was placed under quarantine due to unit contacts with a positive case of COVID-19 for his and other inmates' safety. As of at least October 19, 2021, his unit is no longer quarantined. As to the second concern, the planned maintenance he references occurred on October 8, 9 and 10, starting at approximately 6:00 p.m. and concluding at approximately 1:00/2:00 a.m. each night. The government has been advised that during this planned maintenance, corrections officers were conducting regular rounds throughout MDC to identify and remediate issues, and the Warden and management were there throughout to ensure that any adverse conditions were addressed. While the government does not seek to minimize any issue caused by such maintenance, it has concluded. Nor should the completion of work to improve conditions at the facility become a basis for release.

V.  Conclusion

For all the reasons stated above, the government respectfully submits that Domenick Ricciardo's renewed application should be denied and the permanent order of detention remain in effect.

Respectfully submitted,

BREON PEACE
United States Attorney

By:      /s/
James P. McDonald
Devon Lash
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (ARR)
Robert Caliendo, Esq. (Counsel for the defendant)