

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JPM/DEL/MWG/ADR
F. #2020R00637

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 30, 2023

By ECF

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:   United States v. Domenick Ricciardo
              Criminal Docket No. 21-466 (S-1) (HG)

Dear Judge Gonzalez:

      The government respectfully submits this letter in advance of sentencing in the above-referenced case, currently scheduled for June 6, 2023. On December 14, 2022, the defendant Domenick Ricciardo pleaded guilty to racketeering, in violation of Title 18, United States Code, Section 1962(c), in connection with multiple crimes he committed as an associate of the Colombo organized crime family of La Cosa Nostra. For the reasons below, the government respectfully requests that the Court impose a sentence of 42 months' imprisonment.

I.     Background

    A.    The Offense Conduct

      The defendant is a longtime associate of the Colombo crime family. Presentence Investigation Report dated March 30, 2023 ("PSR") ¶¶ 14, 19, 28. Here, the defendant's work for the crime family included his long-term extortion of an official at a Queens-based labor union (identified as "John Doe #1" in the Superseding Indictment) and his misuse of identification documents to issue fraudulent workplace-safety training certifications to construction industry workers. The defendant carried out these activities with the full knowledge that those he surrounded himself with and reported to were members of a violent criminal organization; indeed the defendant traded on the crime family's reputation repeatedly in his dealings with John Doe #1.

        1.    Extortion

      The principal conduct underlying the defendant's racketeering conviction was his years' long involvement, alongside co-defendant and cousin Vincent Ricciardo, in threatening

John Doe #1 and thereafter collecting extortion payments from John Doe #1.  The extortion schemes at issues in this case evolved over time, beginning with obtaining monthly payments from the salary of John Doe #1 and then, later, attempting to force John Doe #1 to make decisions within a labor organization (the "Labor Union") that benefitted the Colombo crime family; manipulating the selection of an employee welfare benefit plan's ("Health Fund") vendors in order to have the Health Fund contract with entities and individuals associated with the Colombo crime family; and seeking to divert more than $10,000 per month from the Health Fund's assets to the defendants and their co-conspirators.

The defendant's roles in the extortion included contacting John Doe #1 (in person and by phone) on behalf of Vincent Ricciardo, threatening John Doe #1, and collecting monthly payments from John Doe #1, which the defendant would provide to Vincent Ricciardo.  The defendant's involvement with the Labor Union and Health Fund dates back to the early 2000s, when the defendant was employed as an administrator for the Health Fund (indeed, several of the co-defendants have prior relationships with either the Labor Union or Health Fund).  PSR ¶ 178.  The defendant's collection of payments from John Doe #1 also goes back to the mid-2000s when the defendant collected money for Vincent Ricciardo while his cousin was incarcerated.  PSR ¶ 34.

At some point in late 2019 or early 2020, the defendant attempted several times to contact John Doe #1 by phone.  PSR ¶ 35.  After John Doe #1 did not answer the defendant's calls, the defendant approached John Doe #1 in a grocery store and told him that Vincent Ricciardo, his co-defendant in this case, needed to speak with him.  PSR ¶ 35.  Shortly thereafter, on January 23, 2020, Vincent Ricciardo and co-defendant Michael Uvino went to John Doe #1's home at night to threaten him and demand money from him.  PSR ¶ 35.  Three days later, on January 26, 2020, the defendant also went to John Doe #1's home and tried to collect the monthly extortion payment that Vincent Ricciardo and Uvino had sought days earlier.  John Doe #1 was not home at the time.  The defendant was recorded on video surveillance at John Doe #1's home (which the government has a still image of).  In a subsequent call between John Doe #1 and the defendant (which was not recorded), the defendant threatened John Doe #1 and his spouse.  PSR ¶ 36.  Several days later, on February 3, 2020, John Doe #1 received text messages from the defendant, asking when John Doe #1 wanted to meet.  John Doe #1 then left a payment for the defendant to retrieve.  About one month later, the defendant again contacted John Doe #1 by text message to see when the extortion payment would be delivered.  PSR ¶ 37.  One month later, in April 2020, Domenick Ricciardo ("DR") again pressured John Doe #1 ("JD#1") by text message, as reflected in the following conversation:

**April 2, 2020**
> DR     (1:19 p.m.):    Whats up?  U stopping by?
>           (2:05 p.m.):    Hey this is the 2nd text, there isnt going to be a 3rd.
> JD#1   (2:06 p.m.):    [Restaurant name]
>           (2:06 p.m.):    Don't understand
> DR     (2:09 p.m.):    ? Its there?
> JD#1   (2:09 p.m.):    It's been there since I was asked last week

|      |              |                                                                 |
|------|--------------|-----------------------------------------------------------------|
| DR   | (2:10 p.m.): | First im hearing about it                                       |
|      | (2:13 p.m.): | They open?                                                      |
| JD#1 | (2:14 p.m.): | Yes.                                                            |

The foregoing messages clearly evidence the extortionate tactics of the defendant. For example, in the messages outlined above from April 2020 (during the beginning weeks of the Covid-19 pandemic), the defendant told John Doe, "Hey this is the 2nd text, there isn't going to b a 3rd," an unmistakable reference to resorting to violence if the defendant's demands were not met. PSR ¶ 37.

In May 2020, the defendant again texted John Doe #1 to demand the monthly extortion payment. During this exchange, John Doe #1 informed the defendant that his paycheck had been delayed and reduced by COVID-19 shutdowns. The pandemic no hindrance to the defendant, however, as he pressed the issue to demand the money:

**May 1, 2020**

|      |              |                                                                          |
|------|--------------|--------------------------------------------------------------------------|
| DR   | (4:30 p.m.): | Whats up?                                                                |
| JD#1 | (4:32 p.m.): | Not a lot.                                                               |
|      | (4:32 p.m.): | What's going by you?                                                     |
| DR   | (4:34 p.m.): | Nothing, stuck n house like everybody- u swing by?                       |
| JD#1 | (4:35 p.m.): | Not going to happen this month. Due to massive layoffs. I have not got a paycheck. |
|      | (4:35 p.m.): | It's crazy out there                                                     |
| DR   | (5:40 p.m.): | When did u no u werent getting pd?                                       |
| JD#1 | (5:54 p.m.): | No clue. Nobody working.                                                 |
| DR   | (5:57 p.m.): | Ur friend wants 2 no when u knew their was no pay                        |
| JD#1 | (6:06 p.m.): | Just recently                                                            |
| DR:  | (6:13 p.m.): | Ur friend says thats not an answer was it this wk last wk last month     |
|      | (6:24 p.m.): | Haven't gotten an answer yet he says its a simple question               |
| JD#1 | (6:26 p.m.): | Don't understand                                                         |
| DR   | (6:29 p.m.): | When did u no their was no pay- just recently- is no answ                |
| JD#1 | (6:42 p.m.): | Dont know what you want to hear. I. Can't give what I don't have         |

Toll records showed that during this exchange, the defendant and Vincent Ricciardo spoke repeatedly. Further, the defendant continued to pressure John Doe #1 the following day:

**May 2, 2020**

|      |              |                              |
|------|--------------|------------------------------|
| DR   | (1:00 p.m.): | What time do u want to met?  |
|      | (1:40 p.m.): | Did u talk to ur friend yet? |
|      | (1:47 p.m.): | How about a yes or no        |
|      | (2:53 p.m.): | Im not texting no more       |
| JD#1 | (3:26 p.m.): | Didn't have my phone.        |
| DR:  | (3:29 p.m.): | Ck with ur boss              |

> JD#1 (3:30 p.m.): Don't know what you want to hear. I can't give what I don't have.

As with earlier messages, the defendant clearly referenced his working on behalf of Vincent Ricciardo when he describes, "Ur friend wants 2 no when u knew their was no pay" and "Ck with ur boss," to John Doe #1. And when John Doe #1 described that he was not receiving money due to the shutdowns from Covid-19, the defendant continued to pressure him (and the investigating showed that John Doe #1 was required to pay the balance the following month).

In August 2020, after John Doe #1 left the monthly extortion payment for pickup, law enforcement officers surveilled the defendant retrieve the extortion payment and then drive to meet with Vincent Ricciardo, Uvino and others. The defendant's involvement continued into 2021 when Vincent Ricciardo traveled out of the New York area to North Carolina. The defendant then, for example, stepped in to collect $5,000 monthly payments meant for Vincent Ricciardo that a cooperating witness represented were Vincent Ricciardo's share of a $12,000 payment to a "consultant" to the Health Fund. At other points during the scheme, the defendant used his knowledge of the Health Fund (from his earlier employment) and discussed how the members of the crime family (once the infiltration was successful) would "knock down" the salaries of various officials at the Labor Union and Health Fund.

In sum, at various stages spanning over a decade, the defendant played a critical role in extorting John Doe #1. During this scheme, at least $312,000 in extortionate payments by John Doe #1 were made to benefit members of the Colombo crime family (and principally Vincent Ricciardo).

2. OSHA Scheme

The defendant also participated in a scheme to sell fraudulent Occupational Safety and Health Administration ("OSHA") training certifications, as well as other construction-related certifications, by falsifying records to indicate mandatory safety trainings for construction workers had been taught. PSR ¶ 42. As described in the government's prior sentencing letter for co-defendant John Ragano, Ragano operated two occupational safety training "schools;" one facility was in Franklin Square, New York and the other was located in Ozone Park, New York. Both facilities claimed to provide workplace (and other safety) trainings, but instead operated as mills issuing fraudulent certifications to hundreds of individuals who did not take part in the training required for the issuance of these certifications. PSR ¶¶ 44-54.

The defendant worked inside the training schools to recruit "students" and assist them in completing the necessary paperwork to submit to various federal or state agencies to obtain the certifications. PSR ¶ 50. Along with co-defendant John Glover, the defendant, at Ragano's direction, issued fraudulent OSHA certifications, as well as other construction-related certifications, to hundreds of people who did not attend or complete any required training or attended or completed only a portion of the required training. PSR ¶¶ 50-53. Instead, the "students" paid cash to the conspirators to obtain certificates of course completion. The applicants (or their employers) would email, text, or drop-off photocopies of driver's licenses

and identification documents that the co-conspirators would then misuse to complete the necessary OSHA or other regulatory paperwork. After approximately a month, the certification cards would arrive, and the defendant and his confederates would contact the applicants so they could pick up their certification cards. PSR ¶ 53.

The scheme was lucrative, as Ragano charged between $150 and $500 per training card, and if an applicant did not sit for any portion of a class, that applicant or group of applicants was usually charged more. PSR ¶ 54. The defendant's role in the scheme was confirmed through wiretap interceptions, consensual recordings, and by an undercover law enforcement officer ("UC-1") who met repeatedly with the defendant to receive multiple fraudulent training certifications, including an OSHA-30 (hour training) card and a Site Safety Training ("SST"). The card was issued in the name of co-defendant Glover. On October 1, 2020, the defendant provided UC-1 with a blank test form for the OSHA-30 card, an answer sheet for that test, and a sign-in sheet for the class roster. UC-1 paid the defendant $200 in cash. PSR ¶ 56. The defendant instructed UC-1 to return in two weeks with the $300 balance for the OSHA-30 card. When UC-1 returned on October 26, 2020, the defendant gave UC-1 an OSHA-30 card in exchange for the remaining balance of $300. UC-1 did not attend any required OSHA training class or complete any class requirements. PSR ¶¶ 57-60. In November and December 2020, the defendant also provided UC-1 an SST card in exchange for $450, despite that again UC-1 had not attended any required training classes or completed any class requirements. PSR ¶ 59.

During intercepted phone communications, the defendant was also recorded negotiating to sign up customers for the fraudulent classes. PSR ¶ 63. For instance, on September 2, 2020, the defendant spoke to an individual about potentially signing up 17 individuals for the class to obtain OSHA-10 (hour training) cards, saying, "Well if you, for 17 guys, I'll talk to my boss, alright? I'll talk to my boss and see what he says as far as price goes. Alright, 'cause if you, if you could bring, if you could bring in 17 guys, that's be a whole class by itself. We might be able to do something. Okay?" PSR ¶ 63.

B. Procedural History

A grand jury in this District returned an indictment against the defendant and others on September 8, 2021. The defendant was charged with racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Two); Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Three); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Four); attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); conspiracy to commit fraud in connection with means of identification, in violation of 18 U.S.C. § 1028(f) (Count Six); fraud in connection with means of identification, in violation of 18 U.S.C. § 1028(a)(7) (Count Seven); and conspiracy to make false statements, in violation of 18 U.S.C. §§ 371 and 1001 (Count Eight).

The defendant was arrested on September 14, 2021, and arraigned before the Honorable Taryn A. Merkl, United States Magistrate Judge. The defendant presented a bail application, which the government opposed on the ground that the defendant was a danger to the

community.  Judge Merkl rejected the defendant's application and entered a permanent order of detention with leave to file an amended bail request.  On October 22, 2021, the defendant again sought release, which the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, granted under conditions that the defendant, thereafter, did not satisfy.   The defendant thus has been detained since his arrest.

On April 13, 2022, a grand jury returned a 21-count superseding indictment, which is the operative charging document and contained the same essential counts against this defendant.

On December 14, 2022, the defendant pleaded guilty, pursuant to a plea agreement with the government, to Count One of the superseding indictment charging racketeering as an associate of the Colombo crime family.

    C.    <u>Guidelines Calculation</u>

The government agrees with the Guidelines as calculated in the PSR (¶¶ 104-126), which are as follows:

**<u>Count One: Racketeering</u>**

    <u>Racketeering Act 1: Extortion Conspiracy</u>

| | |
|---|---:|
| Base Offense Level ((§§ 2E1.1(a)(2), 2B3.2(a)) | 18 |
| Plus: Offense Involved Threat of Bodily Injury (§ 2B3.2(b)(1)) | +2 |
| Plus: Demand or Loss to Victim Exceeded $95,000 (§§ 2B3.2(b)(2), 2B3.1(b)(7)(C))) | <u>+2</u> |
| Total: | <u>22</u> |

    <u>Racketeering Act 3: Conspiracy to Commit Fraud with Identification Documents</u>

| | |
|---|---:|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Plus: Offense Involved More than $250,000 (§ 2B1.1(b)(1)(G)) | +12 |
| Total: | <u>18</u> |

    <u>Multiple Racketeering Act Analysis (§ 3D1.4)</u>

| | |
|---|---:|
| Highest Adjusted Offense Level | <u>22</u> |
|     Units: | |
|         Racketeering Act 1 (§ 3D1.4(a)) | 1 |

| | |
|---|---|
| Racketeering Act 3 (§ 3D1.4(a)) | 1 |
| Total Units | 2 |
| Levels Added (§ 3D1.4): | +2 |
| Less:  Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Total: | <u>21</u> |

Because the defendant is in criminal history Category I, PSR ¶ 129, the resulting Guidelines range calculated in the PSR is 37 to 46 months' imprisonment.  PSR ¶ 188.

The defendant objects to several factual assertions in the PSR by either offering an unsupported denial of those facts, see Def. PSR Objection ¶¶ 27, 28, 29, 34, 41, 94, or raising legally irrelevant contentions that, the government respectfully submits, have no bearing on the Guideline calculation or the seriousness of the defendant's conduct, id. ¶¶ 1A, 1B, 20, 28, 29, 94. For example, while the defendant objects to the characterization that he worked "under the direction of . . . Uvino," he omits to note that, first, Uvino was an inducted <u>member</u> of the Colombo crime family while the defendant was an <u>associate</u>; and, second, that both the defendant and Uvino were former employees of the Labor Union/Health Fund and utilized their unique knowledge from their employment to work <u>together</u> to extort the current management and advise Vincent Ricciardo and others on the schemes.

Finally, the defendant's contention that he should receive a two-level reduction for a global resolution is contrary to the terms of his plea agreement.  Def. PSR Objection ¶ 126. The conditions set forth in the agreement for the government to seeking such a reduction on the basis of a global plea were plainly not satisfied, and the acceptance of responsibility reduction and any permissible arguments under 18 U.S.C. § 3553(a) are the appropriate manner to address the additional benefit (if any) the defendant receives for his guilty plea.

III.    <u>The Appropriate Sentence</u>

   A.    <u>Applicable Law</u>

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."  <u>Id.</u> at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

### B. Argument

The government respectfully submits that a sentence of 42 months' imprisonment is appropriate in view of the serious, long-running nature of the conduct, the defendant's voluntary associations with a violent organized crime family and co-defendants, the significant harm to his victim, and the need for deterrence.

#### 1. The Nature and Circumstances of the Offense Warrant a Guidelines Sentence

The defendant's crimes were very serious on account of their nature (extortion and fraud), the length and repetitiveness of the conduct, and in view of the backdrop of organized crime activity. Foremost, the defendant committed these crimes to benefit, and with the backing and support of, the Colombo crime family, a violent criminal organization. He relied upon the crime family's and its members' reputation for violence in threatening John Doe #1 for the month-after-month payments. The defendant made statements to John Doe #1 clearly premised on his belief that he could bring the violent forces of the crime family to bear if John Doe #1 did not acquiesce to the demands of the Colombo crime family. The defendant did this for the

purpose of creating fear in John Doe #1 and his family.  For someone of the defendant's age and life experience, such actions were not taken hastily, but with decades of understanding and knowledge about the significance of the words the defendant was expressing to John Doe #1.  They were also made with full knowledge as to who his very violent co-conspirators were, and the significant harm they posed to John Doe #1 if their wishes were not followed.

The extortion here continued for well over a decade and involved demanding John Doe #1 make regular payments to Vincent Ricciardo for an unearned "pension" that amounted to nothing more than an organized crime tax on John Doe #1's earnings.  And while the defense will undoubtedly contend that no "actual" harm befell John Doe #1 (a claim that has been lodged by this defendant and his various confederates before), such an assertion fails to consider the profound psychological and physical impact that years of being under the thumb of the mafia would bring any person and his/her family.  It also must be remembered that John Doe #1 acquiesced to the demands (until he didn't under the protection of law enforcement).  Moreover, the defendants made clear their intention to use harm John Doe #1 as they saw their efforts failing to achieve the desired results, which occurred in 2021 as law enforcement's interdiction efforts increased.

Moreover, the criminal conduct also involved a rampant fraud scheme that the defendant contributed significantly to as a worker at Ragano's training schools.  The defendant knowingly profited from creating dangerous working conditions at construction sites.  Again, he did this with other members of organized crime (Ragano was a Bonanno family soldier).  As with other corrupting influence of La Cosa Nostra, their involvement here ultimately put lives at risk for the pecuniary gain of a few.

The serious and long-running nature of the criminal conduct here warrants a significant term of imprisonment.

2. The Defendant's History and Characteristics

The government respectfully submits that the defendant's history and characteristics weigh in favor of a Guidelines sentence.  See 18 U.S.C. § 3553(a)(1).  The defendant has no recent significant work history and has received various government benefits for well over the past decade.  Although the defendant undeniably had significant health challenges, he was still able to work regularly at Ragano's OSHA school, visit John Doe #1's home, and otherwise carry out various acts at the direction of his cousin Vincent Ricciardo.  In short, the defendant had other options but chose the ones that bring him to this sentencing.  As outlined above, these were not rash decisions.  They were made by a capable person who fully embraced protection of and undue benefits to be earned by a wiling association with organized crime.

3. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The sentence must reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A).  As noted above, the defendant's offenses are serious, in particular because he committed them in connection with his association

9

in the Colombo family. By engaging in criminal activity in connection with the Colombo family, the defendant has evidence an utter lack of respect for the law. And the long-running and intentional nature of the harm, the personalization of the threats (visiting a victim's home, sending threats during a pandemic), and rampant fraud are all aggravating factors that merit a punitive term of imprisonment.

4. Affording Deterrence and Protecting the Public

A Guidelines sentence is also necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) & (C). "Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." United States v. Davis, 08 CR 332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010). The defendant has associated with numerous members of organized crime (from both the Colombo and Bonanno crime families) and faces a strong incentive to continue to do so after his release from prison. There is also a clear need to send a broader message that associating with organized crime and supporting such criminal enterprises warrants serious punishment.

IV. Conclusion

For these reasons, the government respectfully requests that the Court impose a sentence of 42 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
James P. McDonald
Devon Lash
Michael W. Gibaldi
Andrew D. Reich
Assistant United States Attorneys
(718) 254-7000

cc: Robert Caliendo, Esq.
United States Probation Officer Frank T. Nikolaidis