**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
**UNITED STATES OF AMERICA**

      **-against-**                                 **21 CR 466 (HG)**

**DOMENICK RICCIARDO***,*

                         *Defendant.*
------------------------------------------------------------x

## DOMENICK RICCIARDO'S SENTENCING MEMORANDUM

**ROBERT CALIENDO, ESQ.**
**31 West 34th St., 7th Floor**
**New York, NY 10001**
**Tel. (646) 668-5615**
rc@caliendo-law.com

*Attorney for Domenick Ricciardo*

TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 3

PART ONE: THE OFFENSE CONDUCT ............................................................... 3
Racketeering Act One: Extortion .......................................................................... 4
Racketeering Act Two: OSHA ............................................................................... 6

PART TWO: THE SENTENCING GUIDELINES .................................................. 7
Global Points Are Warranted ................................................................................. 8
The Guidelines Are an Unfair Starting Point ....................................................... 10

PART THREE: NUMEROUS § 3553 FACTORS WARRANT MERCY ................. 12
Domenick Is Unlikely to Reoffend ....................................................................... 12
Domenick Has Experienced Enormous Deterrence .............................................. 14
MDC Conditions Are Abhorrent ........................................................................... 16
Incarceration Here Was Particularly Difficult ...................................................... 19

CONCLUSION .................................................................................................... 24

<u>INTRODUCTION</u>

Domenick Ricciardo respectfully submits this sentencing memorandum addressing the offense conduct, sentencing guidelines, and various 18 USC § 3553 grounds for a non-guidelines sentence.

<u>PART ONE: THE OFFENSE CONDUCT</u>

On Dec. 14, 2022, Domenick pled guilty to racketeering. 18 USC 1962(c) ("unlawful … associat[ion] with an[] enterprise … through a pattern of racketeering activity"); ECF No. 286 at 10 (indictment count one). That included an extortion conspiracy relating to a particular union official and a fraud conspiracy relating to bogus OSHA[1] cards. *Id.* at 11, 17 (racketeering acts one and three). Domenick was not convicted of racketeering act two, nor charged with extortionate credit collection (racketeering act four), marijuana (racketeering act five), money laundering (racketeering act six), healthcare fraud conspiracy (counts 14 to 16), or firearms (counts 20 and 21).

Domenick was an "associate" not an inducted member of any racketeering enterprise. PSR ¶ 19; ECF No. 397 at 17 ("associate" not a "soldier" or "member"). And association was limited to the instant case. Domenick's arrest was the first time meeting many codefendants, such as Russo, Persico, Castellazzo, DiMatteo, and Ferrara. *Compare to* PSR ¶ 19 (charting co-d so-called leadership "roles"). "[T]here is no

---

[1] https://www.osha.gov/aboutosha (last visited 3/13/23).

evidence that Domenick [] expressed any leadership authority over another co-defendant or co-conspirator." PSR ¶ 94. He "took orders" from others. PSR ¶ 19; PSR ¶ 40 ("repeatedly took direction from" others); ECF No. 472 at 4 (government sentencing memo describing acting at the "direction" of others); *id.* at 5 (describing Domenick's inability to set OSHA "price[s]" without input from his "boss").

<u>Racketeering Act One: Extortion</u>

"The charges followed [a] one-year investigation … into" those "extorting a senior official of a Queens-based labor union." ECF No. 397 at 17-18 (government opposition to pretrial motions). That "principally entailed Vincent Ricciardo collecting $2,600 monthly in salary from John Doe #1, which [Vincent] Ricciardo sometimes referred to as a 'pension' for himself from the Labor Union." *Id.*

Eventually, Domenick helped Vincent by picking up that cash. Domenick was a "stand-in" to "collect[]" the money with no cut for himself. PSR ¶ 94. For example, "law enforcement … surveilled Domenick retriev[e money left at a pizzeria, and then] traveled directly to meet with" another "at a restaurant" where Domenick dropped off "the money." PSR ¶ 39. Domenick did this to help his relative not to advance himself in any organization.

Explicit threats weren't made to Doe but Domenick readily acknowledges that Doe "believed … [that others] could cause harm to" him. PSR ¶ 35; ¶ 92 ("Doe feared

the threat of harm"). And whether threats were empty or not, Domenick's "text messages" pestering Doe about the money carried such implicit threats. PSR ¶ 37.

While in no way minimizing the criminality and severity of implicit threats, it bears emphasis that no violence whatsoever is attributed to Domenick at any point. The government boasts that this "investigation revealed through multiple recorded conversations and other sources that the defendants demonstrated a willingness to commit violence." PSR ¶ 84. But not Domenick. That's unsurprising given he walks with a cane, can barely get around, and can't make a fist. PSR ¶¶ 150-162 (detailing numerous medical conditions). His doctor describes "severe, deforming rheumatoid arthritis [causing] difficulty with performing tasks … and [] challenges with mobility as well." PSR ¶ 157, quoting Ex. A, Letter and Records from Dr. Julie Schwartzman-Morris at 1.

Domenick has known Doe around 30 years. They met when Doe was running an auto-glass repair shop and he fixed Domenick's car window. They became friendly and socialized sporadically, including for example, BBQ's or July 4th parties at Doe's house. Later, they worked together at a union benefit fund and became much closer. They socialized often outside of work. They ate countless meals together including at their homes. Shared activities included cooking, fishing, hunting and golf. They'd often take 6am tee-times at Forest Park Golf Course to play before work started. Doe invited Domenick to his wedding. They made a YouTube cooking video together at

Domenick's house called Field to the Fork. They went on vacations to Saratoga to watch horse races.

In the early/mid 2000's substance abuse wrecked Domenick's life. PSR ¶¶ 176 – 179, 163 – 170; Ex. B, Mitigation Report at 3-4. As of at least Nov. 2004, Domenick's own mother was trying to evict him. *Ricciardo v. Ricciardo*, 6 Misc. 3d 223, 785 N.Y.S.2d 903 (Kings Co. Civ. Ct. 2004). Around 2005 or 2006, when Domenick was at his lowest, "he expressed suicidal ideation." PSR ¶ 162. It was Doe and Doe's mother who "intervened, remov[ing] his [hunting] firearms" to prevent self harm. *Id.* And it was Doe who later "took defendant into Coney Island Hospital" when he was depressed. *Id.* Doe even picked him up from a homeless shelter one year and took Domenick to Doe's parents' house for Christmas Eve dinner. More recently, when Domenick moved into his Franklin Square apartment, it was Doe who helped him move. For Doe's brother's 50th birthday, Doe and Ricciardo took Doe's brother to a Bob Seger concert in Brooklyn.

At the risk of repetition, this information is not offered to minimize conduct. It's only to provide context absent in the PSR and government papers. Domenick acknowledges the conduct as criminal and extortion.

<u>Racketeering Act Two: OSHA</u>

At the OSHA school, Domenick processed paperwork as a "clerk" and dealt with customers to facilitate issuing the cards. PSR ¶¶ 50, 94. For example, he gave an "undercover" a "blank test form" and "answer sheet." PSR ¶ 56. While "not every

6

OSHA card issued … was fraudulent," it was "[o]ften the case that no applicants attended any classes." PSR ¶¶ 52, 54; ECF No. 472 at 5 (government sentencing memo acknowledging that some "applicant[s] did [] sit for" the "class"). Domenick offered no unique skill, experience, or knowledge. *Compare to* PSR ¶¶ 97, 99 (describing others as "integral" or exercising "control"). The "criminal conduct associated with this business began in 2020" but the pandemic shuttered the business for months. PSR ¶ 49, fn.5.

## PART TWO: THE SENTENCING GUIDELINES

Racketeering Act 1: Extortion Conspiracy

| | |
|---|---:|
| Base Offense Level per §§ 2E1.1(a)(2), 2B3.2(a) | 18 |
| Express or Implied Threat of Injury per § 2B3.2(b)(1) | +2 |
| Demand or Loss Exceeded $95,000 per §§ 2B3.2(b)(2), 2B3.1(b)(7)(C) | +2 |
| | Total: 22 |

Racketeering Act 3: OSHA Fraud

| | |
|---|---:|
| Base Offense Level per § 2B1.1(a)(2) | 6 |
| Offense Involved More than $250,000 per § 2B1.1(b)(1)(G) | +12 |
| | Total: 18 |

Multiple Racketeering Act Analysis per § 3D1.4

| | |
|---|---:|
| Highest Adjusted Offense Level | 22 |
| 1 Unit Each for Racketeering Acts 1 & 3 per § 3D1.4(a) | |
| 2 Total Units = 2 Levels Added per § 3D1.4 | +2 |
| | Total: 24 |

Minus

| | |
|---|---:|
| Global resolution per § 5K2.0 | -2 |
| Acceptance of responsibility per § 3El.1(a) | -3 |
| | Total Adjusted Offense Level: 19 |

A total adjusted offense level of 19, in CHC I, yields an advisory guideline range of 30 to 37 months. There is no statutory minimum term of imprisonment.

<u>Global Points Are Warranted</u>

Domenick's plea agreement calls for a "two-level reduction for a global resolution" if 12 out of 14 defendants "agree[d] in principle" to plea before Dec. 9, 2022. Plea Agreement at fn.1 & ¶ 14. To date, John Ragano, John Glover, Vincent Martino, Domenick Ricciardo, Thomas Costa, and Richard Ferrara have pled. Counsel is informed that the government is presently and actively negotiating with another large group. But since not everyone pled yet, the government "*may* [] elect not to recommend a reduction under the Guidelines for a global disposition." *Id.* (emphasis supplied).

The government commonly sticks by the global points when a meaningful group pleads. *U.S. v. Louis Love*, 19 CR 378 (EDNY 2021), ECF No. 259 at 7 (Gov. Sent. Memo) ("[a]lthough the conditions for the one-level global resolution reduction have not been entirely satisfied, the government nevertheless recommends a one-level reduction under the Guidelines for a global disposition"); *U.S. v. Jose Battle*, 19 CR 378 (EDNY 2021), ECF No. 265 at 6 (same); *U.S. v. Stephon Rene*, 15 CR 287, ECF No. 548 at 8 (2018) ("[d]espite the fact that the conditions of the two-level [global] reduction have not been met, the Government, nonetheless, reiterated its commitment to recommending a two-level reduction in its sentencing memorandum"); *U.S. v. Aikiam Floyd*, 15 CR 287, 2018 WL 3918166 (EDNY Aug. 14, 2018) (same).

Global points are especially deserved here. Pre-plea, the government initially suggested a 9-defendant trial "Group 1" and a 5-defendant trial "Group 2." ECF No. 382-11 at 2-3. "Group 2" is now entirely gone. *Id.* The government (informally) said they didn't want to be stuck trying an awkward combination of, for example, one RICO defendant, one from the healthcare fraud, and one from the OSHA. Preventing just that, the six who pled include everyone (except Vincent Ricciardo[2]) accused of the "fraudulent [OSHA] scheme" and the "marijuana … conspiracy." ECF No. 286 at 9, 28.

Even motion practice streamlined. ECF No. 397 at 19 (government's omnibus motion answer) ("while not germane to the four defendants who have filed the instant motions, the Superseding Indictment alleged [a conspiracy] to falsify paperwork and misuse identification documents to fraudulently generate construction safety certifications, to distribute marijuana…").

In the government's words, "concerns of a 'mega-trial' of '14 defendants' are now moot [because] six of those defendants have pleaded guilty." ECF No. 419 at 18 (government opposition to Persico's severance motion); ECF No. 464 at 9 (severance decision highlighting the same point). The government can refine both its proof and trial groups. "[A]ll remaining defendants … were part of a common scheme to siphon

---

[2] Vincent was a very minor player in the OSHA and marijuana charges especially as compared to his other counts. *See*, ECF No. 419 at 28 (government opposition to Persico's severance motion) ("loansharking, drug-trafficking, false statements, and possession of ammunition are discrete and easy to distinguish from the labor union scheme, the government does not expect that any of these criminal schemes will be a principal focus of trial").

monies from the Labor Union and the Health Fund through vendor contracts." ECF No. 419 at 21; ECF No. 464 at 6 ("central scheme" of what's left is the effort "to extort the Health Fund"), 8-10 ("the Court accepts the government's representation that the evidence at trial will focus mainly on the scheme to defraud the Health Fund and Labor Union").

The government asserts that the entire case can now be presented to a "single jury." ECF No. 419 at 16, 20 (citations omitted). And even if two trials are needed, those remaining fit neatly in two groups – RICO and non-RICO healthcare fraud. ECF No. 419 at 12-15 (chart detailing remaining charges).

<u>The Guidelines Are an Unfair Starting Point</u>

*Booker* requires the Court to "consider the Guidelines." 543 U.S. 220, 259 (2005). And SCOTUS stubbornly insists that "the Guidelines should be the starting point and the initial benchmark." *Peugh v. U.S.*, 569 U.S. 530, 536 (2013). But real-world judging says otherwise, with a nationwide consensus that racketeering guidelines are unduly harsh. Sentencing Commission statistics illustrate the point.

Across "1,342 cases reported to the Commission" for "extortion/racketeering" from 2015-2021, "within range" sentences *never* capture a majority.[3] "Within range"

---

[3]   https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited 3/27/23, under the "Guideline Application" tab, and filtering for: "Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Extortion/Racketeering; Guideline: All; Drug Type: All; Criminal History: All; Career Offender Status: All").

sentences in those parameters top out at "48.1%" and dip as low as "27.4%." *Id.*
Controlling for offenders like Domenick whittles the figures down more. For those
"51" and older, in CHC "I", and "exclud[ing] career offenders" for the same time
period, it's "20.7%, 29.4%, 20.8%, 48.1%, 42.1%, 35.0%, [and] 18.5%."[4] Indeed, "non-
government variance[s]" alone consistently outpace within range sentences, with annual
percentages of "37.9%, 35.3%, 58.3%, 37.0%, 47.4%, 40.0%, [and] 33.3%." *Id.*

A sizeable 36.9% of those same offenders – more than a third – wind up with a
"fine only, … probation only," or a sentence with "alternatives."[5] Even for those with
straight jail, a whopping "76.0%" get a sentence only "up to 24 months."[6] Their
"average" sentence is "23" months and the "median" is "12." *Id.* All noticeably less

---

[4]   https://ida.ussc.gov/analytics/saw.dll?Dashboard   (visited 3/27/23, under the "Guideline
Application" tab, and filtering for: "Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: All;
State: All; District: All; Race: All; Gender: All; Age: 51-60,Over 60; Citizenship: All; Education: All;
Crime Type: Extortion/Racketeering; Guideline: All; Drug Type: All; Criminal History: I; Career
Offender Status: Exclude Career Offenders").

[5] "Alternatives" are "conditions of confinement as described in USSG §5C1.1" such as community
confinement or home detention. https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited 3/27/23,
under the "Sentencing Outcomes > Sentencing Type" tab, and filtering for: "Fiscal Year:
2015,2016,2017,2018,2019,2020,2021; Circuit: All; State: All; District: All; Race: All; Gender: All; Age:
51-60,Over 60; Citizenship: All; Education: All; Crime Type: Extortion/Racketeering; Guideline: All;
Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career
Offenders").

[6]   https://ida.ussc.gov/analytics/saw.dll?Dashboard   (visited 3/27/23, under the "Sentencing
Outcomes > Sentencing Length" tab, and filtering for: "Fiscal Year:
2015,2016,2017,2018,2019,2020,2021; Circuit: All; State: All; District: All; Race: All; Gender: All; Age:
51-60,Over 60; Citizenship: All; Education: All; Crime Type: Extortion/Racketeering; Guideline: All;
Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career
Offenders").

than Domenick faces. For an offender like Domenick – even *with* the global points – a guidelines sentence is an outlier while a meaningful variance is the statistical norm.

## PART THREE: NUMEROUS § 3553 FACTORS WARRANT MERCY

Domenick has endured many hardships detailed in a comprehensive report. Ex. B, Mitigation Report. Those include family struggles and abandonment, homelessness, substance abuse coupled with recovery, and medical issues. *Id.* Domenick also enjoys support from family and friends. Ex. C, Support Letters. And Domenick himself expresses contrition and remorse. Ex. D, Domenick's Letter.

### Domenick Is Unlikely to Reoffend

"Age is one of the most robust correlates of criminal behavior."[7] At 58 years old, Domenick is remarkably unlikely to re-offend. That's because "recidivism drops substantially with age." *Simon v. U.S.*, 361 F.Supp.2d 35, 48 (EDNY 2005) (resentencing "43 year[]-old" defendant below guidelines), *citing U.S. v. Nellum*, 2005 WL 300073 at *3 (ND Ind. 2005); *U.S. v. Comorna-Rodriguez*, 2005 WL 840464 at * 4 (SDNY 2005) ("declin[ing] to impose Guidelines sentence[] on defendant[] who [was] over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants").

---

[7] Sweeten, G., Piquero, A. R., & Steinberg, L., *Age and the Explanation of Crime, revisited*, Journal of Youth and Adolescence, 42(6) (2013).

This holds especially true for Domenick and there is no need "to protect the public from" him. 18 U.S.C. § 3553(a)(2)(c). He is not a kid with designs on climbing an underworld ladder. *See, e.g.,* Discovery at RUSSOETAL000008063_Facility 516-350-4402-PWDM\0BFQ (linesheet page 128) ("Vin, when have, you've known me my whole life, when have I ever taken advantage of who I am … in relationship to you? Have I ever? He goes, 'No.' I says, So what makes you think I'm gonna do it now?").

Domenick's post-release plans are to get as far away as possible. He intends to move to North Carolina and live with his 52-year-old cousin Lisa,[8] a homemaker, her husband, and their twenty-something son and daughter. PSR p. 2 (listing the North Carolina address as Domenick's).

In the same vein, after protracted bail litigation, Judge Ross didn't remand him – she set "new conditions [of release] outlined on the record." 10/26/21 Minute Entry. Domenick needed a suretor who was not an immediate family member of Vincent. ECF No. 472 at 5 (government sentencing memo noting release "conditions" were set but that "defendant, thereafter, did not satisfy" them). Domenick could have bailed out and dragged the case out. But he stayed in, choosing to accept incarceration and responsibility, and work towards a fresh start.

---

[8] Lisa is Vincent's daughter. Given Vincent's health and the government's confidence about his current guideline range, it does not appear he will come home absent acquittal.

<u>Domenick Has Experienced Enormous Deterrence</u>

Almost thirty years ago, Domenick pled guilty to a "driving-while-impaired" violation, his only prior arrest. VTL § 1192(1).[9] To call this case different would be an understatement. The severity here, coupled with his MDC bid, brings previously unimaginable "deterrence." 18 USC § 3553(a)(2)(b). After years of addiction, Domenick finally got his life back on track. Ex. B, Mitigation Report. He had stability, a car, and a steady suburban apartment. *Id.* at 5-6. While in jail his car was sold for scrap and the apartment gone. He's eager to start over, but that comes with almost daily reminders of how quickly he lost what took so long to obtain.

A short sentence provides more than adequate deterrence – especially for Domenick who's never done time. Jail's deterrent value stems from going there in the first place, not being kept there a long time. *See generally,* Daniel S. Nagin, *Deterrence in*

---

[9] It's academic for guideline purposes but PSR ¶ 128 mistakenly assigns this case one point. *U.S. v. Paredes*, 185 F. Supp. 3d 287, 295 (EDNY 2016) ("the Second Circuit has effectively decided this issue [and t]he Commission's [2012] amendment to [§ 4A1.2] Application Note 5, designed to minimize the sentencing courts' discretion [for DWAI offenses], is not binding"); *U.S. v. Potes-Castillo*, 638 F.3d 106, 114 (2d Cir. 2011) ("non-felony driving while ability impaired sentences should be treated like any other misdemeanor or petty offense sentences [subject to exclusionary analysis under] section 4A1.2(c)(1)"). Domenick got a fine and license suspension, not "a term of probation of more than one year or a term of imprisonment of at least thirty days." USSG § 4A1.2(c)(1)(A). As a practical matter, counsel raises this because recent "[r]ecidivism data analyzed by the [Sentencing] Commission suggest that offenders with zero criminal history points … have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." 4/5/23 Preliminary Amendments to the Sentencing Guidelines, pp. 72-73 (https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf) (last visited 4/20/23). "Among other findings, the report concluded that zero-point offenders were less likely to be rearrested than one point offenders [as] the largest variation of any comparison of offenders within the same Criminal History Category." *Id.*

*the Twenty-First Century*, The University of Chicago Press: Crime and Justice, Volume 42 (2013)[10] ("lengthy prison sentences … cannot be justified on deterrence"). "The evidence in support of the deterrent effect of [apprehension probability] is far more consistent than that for the severity of punishment." *Id*. That likelihood "of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent." *Id*.[11]

Prison deterrence offers sharply diminishing returns because "there is widespread recognition among psychologists and criminologists that prisoners adapt to their environment."[12] In other words, incarceration hits hardest at the beginning. Initial weeks or months are a jarring reminder how devastating it is to lose liberty and agency over daily life. But as time passes the "numbing" grows. *Id*.

---

[10] https://www.journals.uchicago.edu/doi/abs/10.1086/670398 (last visited 4/20/23).

[11] *See also*, *U.S. v. Muhtorov*, 329 F. Supp. 3d 1289, 1305 (Dist. of Colorado 2018) ("I am persuaded by the research that individuals are deterred more by the certainty of being caught than the severity of the punishment"); Valerie Wright, *Deterrence in Criminal Justice Evaluating Certainty vs. Severity of Punishment*, Sentencing Project Report (2010) at https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf (last visited 10/18/21) ("[c]riminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment"); Hilde Wermink, Paul Nieuwbeerta, Anke A. T. Ramakers, Jan W. de Keijser, and Anja J. E. Dirkzwager, *Short-Term Effects of Imprisonment Length on Recidivism in the Netherlands*, Crime Delinq. 64(8): 1057–1093 (July 2018) ("length of imprisonment exerts an overall null effect on future rates of recidivism and [] this conclusion holds across the various types of recidivism") (Dutch paper also analyzing U.S. data) at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5971372/ (last visited 10/18/21).

[12] Christian Jarrett, *How prison changes people*, BBC (May 1, 2018) at https://www.bbc.com/future/article/20180430-the-unexpected-ways-prison-time-changes-people (last visited 10/18/21) (also describing "a process of emotional numbing" and "harden[ing]").

"When most people first enter prison [] they find that being forced to adapt to an often harsh and rigid institutional routine, deprived of privacy and liberty, and subjected to a diminished, stigmatized status and extremely sparse material conditions is stressful, unpleasant, and difficult."[13] "However, in the course of becoming institutionalized [p]ersons gradually become more accustomed to the restrictions that institutional life imposes." *Id.*

Worse, while "institutionalization" shrinks deterrence returns, it "exacts certain psychological costs" that cause "more difficult and problematic transitions as they return to the freeworld." *Id.* at 77; 18 USC § 3553(a)(2)(D) (stressing "the need … to provide the defendant with … correctional treatment").

<u>MDC Conditions Are Abhorrent</u>

MDC circumstances have been so extreme to warrant a reduced sentence.[14] BOP "[i]nstitutions [still] determine their operational level (Level 1, Level 2, or Level 3) based

---

[13] Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*, p. 80 (2002) (a "paper [] produced for a conference funded by the U.S. Department of Health and Human Services") at https://www.urban.org/sites/default/files/publication/60676/410624-The-Psychological-Impact-of-Incarceration.PDF (last visited 10/18/21).

[14] *Any* harsh prison circumstance can merit leniency. For example, departure can ground in "status as a deportable alien that [leads to an] unwarranted increase in the severity of [] sentence" because contract-facilities are "not eligible for any early release, [] not [] able to serve [their] sentence in a minimum security prison, and [] may not qualify for reduced credits for participation in a residential drug or alcohol abuse program." *U.S. v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (DNM 2005); *U.S. v. Wedd*, 15 CR 616, ECF No. 809, p.4 (SDNY April 9, 2021) ("Judge Forrest initially contemplated sentencing Wedd to 168 months, [but] she considered that [because he was a non-citizen] he would be serving his time in a facility where he would not get time off for good behavior and where he would not have the benefit of certain programs," ultimately giving him to 120 months). As another example, former police officers' "susceptibility to prison abuse" is a departure basis "well within the sound

on [] indicators of COVID-19."[15] "At each level, … modification to operations (such as inmate programming and services) may be made to mitigate the risk and spread of COVID-19." *Id.* "BOP COVID-19 Operational Levels" – red, yellow, and green – "are raised or lowered after 48 hours of respective sustained increases or decreases in the [relevant] indicators." *Id.*

Levels have been elevated the overwhelming majority of Domenick's stay at MDC despite life being back-to-normal for many Americans. Even "yellow" levels mean "limit[ed] capacity" for "commissary / inmate phones / Trulincs [email], … barber shop, … laundry, … law library, … education programs, … psychology services, … religious services, … recreation, … visitation, … and work detail." *Id.* Moreover, "[m]any other general modifications … are in effect due to COVID-19, regardless of the facilities current operation level," such as "quarantine[s or] medical isolation." *Id.*

Scores of judges granted compassionate relief or sentencing leniency because recent prison conditions have "been harsher than [] usual [and thus] more punitive."[16]

---

discretion of the District Court." *Koon v. U.S.*, 518 U.S. 81, 106-112 (1996); *U.S. v. Volpe*, 78 F. Supp.2d 76, 87-89 (EDNY 1999) (government acknowledged authority to depart downward for police officer "vulnerable to abuse in prison" resulting in a "two-level downward departure under § 5K2.0"); *U.S. v. Bruder*, 103 F.Supp.2d 155, 183 (EDNY 2000) (two-level departure for *Volpe's* co-defendant).

[15] https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited 4/19/23).

[16] Stephen Rex Brown, *NYC federal jail is so bad inmates get 'time and a half': Judge*, New York Daily News (May 24, 2021), https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html (last visited 10/18/21) ("it's essentially the equivalent of either time and a half or two times what would ordinarily be served"), referring to *U.S. v. Daniel Gonzalez*, 18 CR 669 (SDNY) (JPO) (docket notation: "[s]entencing held on 4/2/2021 for Daniel Gonzalez [who is] sentenced to time served"). Much less severe than Domenick's experience, *infra*,

The "lockdowns … are 'basically like solitary confinement' [partly because i]nmates have limited programming, next to no family visits and severe limitations on meetings with lawyers." *Id.* And solitary-like conditions are especially hard for Domenick because his rheumatoid arthritis is painfully exacerbated when he can't move around.[17] (discussed further, *infra*).

Both 'pre' and 'post' pandemic MDC conditions warrant leniency.[18] In "January 2019 … power outages [at MDC] had deprived many detainees of heating, electricity,

---

that defendant had a "a recurring foot infection" and lamented being "locked in my cell 23 hours a day, and sometimes we go days without showering and days without phone calls." *Id.*

[17] Additionally, "[s]olitary confinement harms prisoners who were not mentally ill on admission to prison and worsens the mental health of those who were." Peter Scharff Smith, *The Effects Of Solitary Confinement On Prison Inmates: A Brief History And Review Of The Literature*, 34 Crime & Just. 441, 504 (2006). "It is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee." *U.S. v. Bout*, 860 F. Supp.2d 303, 308 (SDNY 2012) (also holding that that continued solitary confinement violated Eighth Amendment rights); Alexa T. Steinbuch, *The Movement Away From Solitary Confinement In The United States*, 40 New Eng. J. on Crim. & Civ. Confinement 499, 508 (2014) ("medical and psychological consequences of solitary confinement are vast, leaving inmates with a variety of negative psychological reactions including: severe and chronic depression, anxiety, problems with impulse control, self-mutilation, decreased brain function, hallucinations, and revenge fantasies"); Michael B. Mushlin, *Unlocking The Courthouse Door: Removing The Barrier Of The PLRA's Physical Injury Requirement To Permit Meaningful Judicial Oversight Of Abuses In Supermax Prisons And Isolation Units*, Federal Sentencing Reporter Volume 24, Number 4, 2012 WL 3288690 ("isolation can have ruinous effects on individuals").

[18] *U.S. v. Rodriguez-Lopez*, 18 CR 868 (SDNY June 10, 2019) (SHS); *U.S. v. Acosta*, 18 CR 667 (EDNY June 4, 2019) (PKC); *U.S. v. Gezer*, 16 CR 282, ECF No. 65 at 12 (SDNY May 8, 2019) (CM) ("I do take account, of the fact that you have now been incarcerated for a full three years in circumstances that were difficult … It is appalling that I have to add to that list [of mitigating sentencing factors] the Metropolitan Detention Center, but I do have to add to that list the Metropolitan Detention Center, where for the last six months, at least, if not longer, the conditions of incarceration have been hellish and unworthy of this country"); *U.S. v. Bruney*, 18 CR 542, ECF No. 32 at 24-25 (EDNY Feb. 27, 2019) (PKC) ("I think punishment has been extreme in this case because of the conditions already endured by this defendant as well as other inmates at the MDC so I think that his sentence in some way in terms of punishment has been longer than the actual time, the chronological period of time he is going to serve"); *U.S. v. Ozols*, 16 CR 692, ECF No. 234 at 30-31 (SDNY Feb. 12, 2019) (JMF) ("Finally, I do believe and will give Mr. Ozols some [sentencing] credit for what he endured at the

hot water, phones, medical care, and other basic services." *Federal Defenders of NY v. Fed. Bureau of Prisons*, 954 F. 3d 118, 123-124 (2d Cir. 2020). Such problems are indicative of what Domenick's endured.[19] For example, in Jan. 2023, Domenick reported problems keeping hot water in the handicap shower that he needs. In Feb. 2023 he reported flooding from the cell above, and noting that the emergency alarm is still disconnected.

<u>Incarceration Here Was Particularly Difficult</u>

Domenick's MDC bid has been marked by excruciating pain, medical problems, and bureaucratic headaches. Upon arrival it took weeks to get certain basic medication. (9/23/21, still have not received blood pressure / water pill meds, aspirin, breathing meds);[20] (9/28/21, still no meds and the pain is getting worse); (9/30, still no meds pain in hips the same); (10/1/21, still no meds and the pain in knee is getting worse).

Next came a months-long hospitalization just after Christmas 2021. PSR ¶ 148 ("multiple hospital visits documented"). In mid-November he felt dizzy and had trouble

---

MDC in the last few weeks…. This is not the forum in which to litigate the full scope of what happened and whose fault it is [but] the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention, whether convicted, not convicted, awaiting sentencing, should have to endure that as the detainees did at the MDC").

[19] Natalie Hernandez, *After latest reports of dangerous conditions at MDC, advocate calls for outside regulatory authority*, NY1 (10/13/21) at https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2021/10/14/metropolitan-detention-center-in-brooklyn-nyc-reports-dangerous-conditions-david-patton-discussion (last visited 6/1/23) (published a month after Domenick's arrival, and detailing "deteriorating living conditions [including] no access to water, [] spotty electricity and lack [of] hot food[, plus] staff shortages").

[20] Notations cited in this format summarize contemporaneous communications between counsel and Domenick. No privileges are waived regardless of what's communicated here.

breathing. Initial BOP cop-outs were met with indifference and sarcasm. After about a month he saw medical staff but not a doctor. A sympathetic physician's assistant prescribed two inhalers to help his oxygen levels. On Dec. 22 he went to an outside hospital with COVID[21] and double pneumonia. He went to two different hospitals and ultimately a physical therapy facility. He was in intensive care for twelve days with pneumonia and COVID. He was on a ventilator. He wasn't cleared to return to MDC until *March*. He wasn't allowed to speak to his family since Christmas. Counsel recalls only talking to him about once or twice to give his family updates that he seemed stable and unlikely to die. Around July l4, 2022, Domenick reported a COVID outbreak in the building, and that he was feeling ill, like before Christmas, but it took five days just to get tested.

Despite the frightening hospitalization, the worst was pain related to his rheumatoid arthritis. He "has severe, deforming Rheumatoid Arthritis [and] requires immune suppressive medications for this condition." Ex. A, Letter and Records from Dr. Julie Schwartzman-Morris at 1; PSR ¶¶ 151, 157 ("immunosuppressant"). "He has difficulty with performing tasks due to severe arthritis in hands [and] has challenges with mobility as well." *Id*. Perversely, while jailed he's had to stop or reduce immune suppressive medications – specifically "hydroxychloroquine" and "methotrexate" –

---

[21] Domenick was vaccinated before jail and had a booster at MDC. Counsel saw his vaccination card.

because of high COVID risk. PSR ¶¶ 150, 157. But he needs the medications to ward off severe pain.

Worse still, the "lockdowns at the MDC prevented him from walking, which thereby caused swelling in his joints," and thus intense pain. PSR ¶ 160. Normally, freedom to just move around is crucial to alleviate the pain. *E.g.* (9/28/21, have an immune disease and take immune suppressants, scared of covid, still no meds and the pain is getting worse); (5/25/22, right now I'm in so much pain from not being able to walk its killing me); (6/30/22, only relief is walking and can't do that); (9/12/22, been complaining about frequent urinating for past 3 weeks, my left leg is swelling up & worried about blood clots because can't walk because of the pain in my feet).

Lockdowns were incessant. *See, e.g.* (9/28/21, lock down for covid till now tues); (10/1/21, lock in for the wknd); (5/28/22, still lock in for 21hrs during the week & 22hrs on the weekend, the staff has lost control of the place, all they know how to do is punish everyone for a couple of trouble makers, the trouble isn't even in this unit); (6/3/22, locked in M-F except 3 hours out, either 6-9, 9-12, 12-3, or 5-8pm… locked in on weekend except 2 hours out and been so for the last month); (6/5/22, just got out at 5:30 been in the cell since 10am sat., 31 1/2 hrs locked in); (1/22/23, lock in at 8 … Tuesday night lock in at 9, Wednesday morning lock in at 11 am until 9:30 Thursday morning, and now on modified lock down out only 2 hrs a day); (3/28/23, lock in since Wednesday, out for 2hrs this week, 1/2 day next week & then normal after). As recently as May 15, 2023, Domenick reports being locked in the past five

weekends due to staff shortages, plus no air conditioning and or shower access when the weather became hot.

Please know that such pain and lockdown reports are illustrative, not exhaustive. This point bears emphasis – *it's excruciating daily pain that often cannot be relieved without the freedom to walk past the cell doors*. The pain's cure is literally just beyond physical reach. Lockdowns are bad enough when inmates sleep, eat, and defecate in a cage within arm's length of another person. Adding that physical pain under those circumstances must be almost unbearable.

Domenick has other medical problems. BOP puts him at "General Care Level Two … requir[ing] outpatient treatment [and] at least quarterly clinical evaluation." PSR ¶ 148.[22] That often requires "enhanced medical resources."[23] He's on over a dozen different medications for various ailments including cardiac issues, a 2010 heart stent, rheumatoid arthritis, asthma, COPD, interstitial lung disease, high blood pressure, diabetes, high cholesterol, high white blood cell count, and acid reflux. PSR ¶¶ 150-160; Ex. A (Schwartzman-Morris records detailing numerous severe conditions and pain). As recently as Feb. 2023 he was taken to the hospital and diagnosed with severe sleep apnea. *See also*, Ex. A at 2 (Schwartzman-Morris records noting "likely apnea"). In

---

[22] Despite this requirement, Domenick's last blood test was in December 2022 and he hasn't had one this year, despite this supposed BOP rule.

[23] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf at p. 4 (last visited 4/27/23).

March 2023 he received a CPAP machine, albeit without the right mask or power cord. In April 2023 he had unusual swelling in his legs.

Bureaucracy exacerbates problems. Some prescribed medications just never arrived. PSR ¶ 160 ("celecoxib … lotrisone cream … [and a] Lidoderm patch"). In the fall of 2021 doctors said he should have certain medical shoes and an egg-crate mattress. Around May 2022 Domenick relayed submitting two written cop-outs and three verbal requests to follow up. Over half a year later, in July 2022 he got the mattress. In Aug. 2022 they took him to get the shoes, but didn't inform the person who was actually supposed to complete that task, and he didn't get the shoes. In March 2023, a year and half late, he got the shoes. By itself, counsel would not mention this. But taken with everything else, it's a useful microcosm. Still, Domenick sought to better himself while incarcerated, completing numerous programs. Ex. E, BOP Program Certificates.

It's widely agreed that MDC is uniquely problematic and time is harder.[24] While undoubtedly byzantine, counsel makes no comment on BOP procedures – pandemic or otherwise. Counsel cannot say where genuine limitations of institutional medical care end and staff indifference or cruelty begins. Nor can counsel know what percentage of

---

[24] One former SDNY Chief "U.S. District Court Judge … castigated [BOP], saying the agency's ineptitude [during the pandemic] … at [MCC] in Manhattan and [MDC] in Brooklyn amounted to the 'single thing in the five years that I was chief judge of this court that made me the craziest'." Shayna Jacobs, *Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions*, Washington Post (May 7, 2021), https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-acd3-24b44a57093a_story.html (last visited 5/10/2021. "The torment she faced in pretrial custody was punishment enough." *Id.*, referring to *U.S. v. Tiffany Days*, 19 CR 619 (SDNY) (CM) (docket notation: "Sentencing held … 4/29/2021 for Tiffany Days").

lockdowns are needlessly punitive or staff preference, versus what percentage genuinely connect to COVID outbreaks, inmate violence, or contraband. For this sentencing it doesn't matter. The only point is that Domenick served much harder time. "The Court should seek proportionality… no matter how strongly it condemns a defendant's behavior" because "[t]he Guidelines… calibrate punishment by varying the length of a prison term, not its severity." *Volpe*, 78 F. Supp.2d at 88; *Pacheco-Soto*, 386 F. Supp. 2d at 1205 (atypical "severity of confinement" warrants "downward departure").

<u>CONCLUSION</u>

A time-served sentence is "sufficient, but not greater than necessary, to comply with the" statutory sentencing criteria. 18 USC § 3553(a).

Dated:       June 1, 2023
             New York, NY

Respectfully submitted,

*/S/ Robert Caliendo*
_____
Robert Caliendo, Esq.
Tel. (646) 668-5615
rc@caliendo-law.com